UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | CRIMINAL NO: |
| SIMONE SWENSON | § | UNDER SEAL |

15 CR 4 0 2

# INDICTMENT

THE GRAND JURY CHARGES:

**COUNTS ONE AND TWO**
**(WIRE FRAUD 18 U.S.C.§ 1343)**

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

## INTRODUCTION

1. Defendant SIMONE SWENSON ("SWENSON") operated in the Houston area under the company name Sans Pareil Center for Children and Family Services, LLC ("Sans Pareil").

2. Sans Pareil, a child care placement agency, was a corporation based in the Southern District of Texas, Houston Division, which was incorporated in 2009. The President of Sans Pareil was listed as Simone Swenson. Sans Pareil catered to adoptive families that desired to participate in domestic private (non CPS) adoption program.

3. Texas Department of Family and Protective Services (TDFPS) Licensing Division has oversight over child placement agencies such as Sans Pareil and requires agencies to meet minimum standards. The Licensing Division does not dictate the amount a child care placement agency can charge their clients for adoptions; however, per the minimum standards, child care placement agencies must have an adoption fee or adoption fee

1

schedule that applies equally to all clients.

4. Sans Pareil was licensed to operate as a foster care agency as well as a child placement agency.

## THE SCHEME TO DEFRAUD

5. From on or about January 2013 to on or about January 2014, the defendant, SIMONE SWENSON ("SWENSON"), devised and intended to devise a scheme to defraud by purporting to match two prospective families with the same birth mother ("double matching"), and to obtain money and property by means or materially false and fraudulent pretenses, representations and promises.

## MANNER AND MEANS OF THE SCHEME TO DEFRAUD

It was part of the scheme that:

6. SWENSON would and did contact prospective families about birth mothers and would not proceed until agency fees and expenses were paid up front.

7. SWENSON would and did charge fees without explanation, and the fees did not apply equally to all adoptive families as required by regulations.

8. SWENSON rarely verified if the birth mothers were actually pregnant and telling the truth prior to receiving her agency fees from the prospective adoptive families.

9. SWENSON was always available and responsive to prospective adoptive families prior to receiving agency fees. However, once SWENSON received the necessary fees from the adoptive families, she was unavailable and would not return phone calls for long periods of

time, if at all. When she did have contact with the adoptive families, she would be brief, inconsiderate, and provide vague information regarding the birth mothers and their delivery status.

10. SWENSON rarely provided invoices or receipts to the adoptive families for their paid fees and expenses. Adoptive families would often ask SWENSON multiple times for proof of payment, and SWENSON would not respond unless there was money to be collected from the adoptive families.

11. Prospective adoptive families, in reliance upon defendant SWENSON's promises and representations ensuring a successful adoption, hired attorneys, hired other adoption agencies, purchased airline tickets, booked hotel rooms, prepared and purchased items for the expected child's nursery and transportation, and incurred other expenses related to the prospective adoption.

12. SWENSON would and did double match birth mothers who expected to have only one baby to multiple adoptive families. Once money was wired and/or mailed into her account from the adoptive families, she would find a way, through lies and misrepresentations, to get out of the double matches.

## ACTS IN FURTHERANCE OF THE SCHEME TO DEFRAUD

In furtherance of the scheme to defraud, the following acts, among others, were committed in the Southern District of Texas and elsewhere:

13. On or about April 20, 2010, Sans Pareil received its initial permit to operate as a foster care agency and as a child placement agency. SWENSON served as the owner and President of

Sans Pareil.

14. On or about August 3, 2012, the Licensing Division found that the money that was given to SWENSON to pay foster families was instead used to pay mortgage payments and for visits to the nail salon. As a result, Sans Pareil's foster care license was revoked.

15. On or about August 28, 2013 the Licensing Division started to receive numerous complaints from prospective adoptive families associated with Sans Pareil. Adoptive families complained about being double matched with the same baby, not receiving invoices for money paid to the agency, and the inability to reach SWENSON or anyone else at Sans Pareil by phone.

**Double Match with Birth Mother T.P. with Adoptive Families M.S. and R.S.**

16. On or about June 12, 2013, prospective adoptive family M.S. signed a Child Placement Services Contract with Sans Pareil for a match with birth mother T.P.

17. On or about June 13, 2013, M.S. wired $13,000 from Chase Bank account xxx-0407 to Sans Pareil's Wells Fargo Bank account xxxx-7055 for fees associated with birth mother T.P.

18. On or about June 28, 2013, M.S. wired $1,500 from Chase Bank account xxx-0407 to Sans Pareil's Wells Fargo Bank account xxxx-7055 for July birth mother expenses for T.P.

19. On or about July 2, 2013, M.S. wired $6,000 from Chase Bank account xxx-0407 to Sans Pareil's Wells Fargo Bank account xxxx-7055 for a "back agency fee" to Caring Adoptions for birth mother T.P. Caring Adoptions was not aware of and never received the "back agency fee" for T.P.

20. On or about July 16, 2013, SWENSON emailed prospective adoptive family R.S.

regarding the agency deposit and birth parent expenses for birth mother T.P.

21. On or about July 18, 2013, R.S. wired $16,000 from Peoples Bank of Wisconsin Bank account to Sans Pareil's Wells Fargo Bank account xxxx-7055 for fees associated with birth mother T.P.

22. On or about July 27, 2013, SWENSON emailed M.S. stating that "things are moving forward with [T.P]. and everything is fine".

23. On or about July 31, 2013, SWENSON emailed R.S. stating that "[T.P.] is doing fine. We speak to her often. We are in the process of requesting med records. Will let you know if anything significant happens."

24. On or about August 2, 2013, SWENSON emailed M.S. stating that T.P. is doing fine and that her next doctor's appointment is August 5, 2013.

25. On or about August 12, 2013, SWENSON emailed M.S. asking them if they have sent expenses this month for T.P.

26. On or about August 13, 2013, M.S. wired $500 from Chase Bank account xxx-0407 to Sans Pareil's Wells Fargo Bank account xxxx-7055 for birth mother expenses for T.P.

27. On or about August 2013, SWENSON told R.S. that T.P. had changed her mind and now wanted to keep the baby.

28. On or about September 12, 2013, SWENSON emailed M.S. for $600 to cover the birth mother expenses for September. SWENSON also stated that T.P. is doing well, and they are in the process of collecting medical records. SWENSON stated that her due date is still in November, and that she will go back to the Woodlands for her delivery.

29. On or about September 12, 2013, M.S. wired $600 from Chase Bank account xxx-0407 to

Sans Pareil's Wells Fargo Bank account xxx-7055 for September birth mother expenses for T.P.

30. On or about September 30, 2013, SWENSON emailed M.S. stating that T.P. is still "on board" with the adoption and placing the baby.

31. On or about October 3, 2013, SWENSON emailed M.S. regarding October birth mother expenses for T.P.

32. On or about October 4, 2013, M.S. wired $500 from Chase Bank account xxx-0407 to Sans Pareil's Wells Fargo Bank account xxx-7055 for October birth mother expenses for T.P.

33. On or about October 29, 2013, SWENSON emailed M.S. regarding November birth mother expenses, as well as the fee to cover the termination process for a total of $2,300.

34. On or about October 29, 2013, M.S. wired $2300 from Chase Bank account xxx-0407 to Sans Pareil's Bank of America account xxx-6024 for birth mother expenses and terminations fees for T.P.

35. On or about November 4, 2013, T.P. gave birth to a baby boy and placed her child for adoption through Caring Adoptions agency. T.P. had been working with Caring Adoptions from on or about July 18, 2013 until the placement of her child with Caring Adoptions on November 5, 2013. Neither R.S. nor M.S. were given the opportunity to adopt T.P's baby.

## Double Match with Birth Mother A.S. with Adoptive Families D.C. and A.N.

36. Prospective adoptive family D.C. mailed a check to SWENSON for $13,400 which was deposited on or about June 7, 2013 into Sans Pareil's Wells Fargo Bank account xxx-7055 for agency fees related to birth mother M. This match failed, and D.C. was later re-matched with birth mother A.S.

37. On or about July 1, 2013, prospective adoptive family A.N. wired $11,700 from Phelps County Bank account to Sans Pareil's Wells Fargo Bank account xxxx-7055 for agency fees related to birth mother K. That match failed, and A.N. was re-matched with birth mother A.S.

38. On or about September 12, 2013, A.N. received an email from N.N., an employee of Sans Pareil, stating that she spoke to SWENSON and that there was no need to send agency fees at this time. N.N. did state that A.N. did need to send $1800 for birth mother expenses for A.S.

39. On or about September 16, 2013, SWENSON emailed N.N. stating "I have to recoup some of these expenses that have gone out. I cannot wait any longer" in regards to A.S. birth mother expenses.

40. On or about September 16, 2013, D.C. emailed SWENSON regarding their conversation on the phone about a possible match with birth mother A.S.

41. On or about September 18, 2013, A.N. mailed a check for $1,800 to SWENSON for birth mother expenses for A.S.

42. On or about September 18, 2013, SWENSON emailed N.N. stating that A.S. is re-matched.

43. On or about September 19, 2013, SWENSON emailed D.C. regarding fees for birthmother

A.S.

44. On or about September 19, 2013, D.C. wired $10,750 from Credit Union One Bank to Sans Pareil's Wells Fargo Bank account xxxx-7055 for fees related to birth mother A.S.

45. On or about September 24, 2013, D.C. booked a flight to Houston for the adoption of A.S.'s child. A.S. gave birth on September 24, 2013.

46. On or about September 24, 2013, SWENSON told birth mother A.S. at the hospital that A.N. had changed her mind, and that the family no longer wanted to adopt her baby. SWENSON then told A.S. that D.C. was waiting in the lobby wanting to adopt her child. A.S. decided to keep her baby at that time, because she had only wanted A.N. to adopt her child and had never heard of or chosen D.C. as a prospective adoptive family.

47. On or about September 26, 2013, SWENSON told A.N. that birth mother A.S. had changed her mind and did not want to give up her baby.

**Double Match with Birth Mother B.P. with Adoptive Families K.R. and M.C.**

48. On or about August 3, 2013, SWENSON emailed prospective adoptive family K.R. regarding expenses and fees for birth mother B.P.

49. On or about August 6, 2013, K.R. wired $20,500 from Morgan Stanley Bank account to Sans Pareil's Wells Fargo Bank account xxxx-7055 for expenses related to birth mother B.P.

50. On or about September 27, 2013, SWENSON emailed K.R. regarding birth mother expenses for B.P.

51. On or about September 27, 2013, K.R. wired $2,400 from Morgan Stanley Bank account to

Sans Pareil's Wells Fargo Bank account xxxx-7055 for B.P. expenses for October and November.

52. On or about November 13, 2013, SWENSON emailed K.R. stating that B.P. is doing well and is due at the end of February.

53. On or about November 14, 2013, K.R. wired $1500 from Morgan Stanley Bank account to San Pareil's Wells Fargo account xxxx-7055 for B.P. birth mother expenses.

54. On or about January 9, 2014, SWENSON emailed prospective adoptive family M.C. regarding fees for matching with birth mother B.P.

55. On or about January 9, 2014, SWENSON emailed M.C. medical records and the intake form for birth mother B.P.

56. On or about January 9, 2014, SWENSON emailed M.C. to sign documents and wire the match and birth parent fees for B.P.

57. On or about January 10, 2014, M.C. signed the child placement services contract for birth mother B.P.

58. On or about January 11, 2014, K.R. received an email from J.S., her adoption consultant, informing her that B.P. is working with another agency and due in June.

59. On or about January 12, 2014, after trying to contact SWENSON numerous times regarding B.P., K.R. received a phone call from SWENSON. SWENSON stated that B.P. had a miscarriage. K.R. had been trying to get a hold of SWENSON many times during November and December 2013 and had not been able to contact SWENSON. K.R. had not received any messages or emails from SWENSON prior to January 12, 2014 regarding the status of B.P.

60. On or about January 15, 2014, SWENSON received an email from M.S., who worked for Crystal Adoptions in North Carolina, discussing a match with B.P. with an out of state couple. M.S. discussed how SWENSON and his agency would be splitting up fees and expenses for B.P.s' adoption.

61. On or about January 15, 2014, D.W. wired $8,550 for prospective adoptive family M.C. from U.S. Bank account to Sans Pareil's Bank of America account xxxx-6024 for expenses related to birth mother B.P.

62. On or about January 28, 2014, SWENSON sent M.C. an email stating that B.P. was doing fine and had a doctor's appointment that day.

63. On or about March 8, 2014, SWENSON sent M.C. an email stating that they were still matched with B.P. but that due to some health issues, M.S. with Crystal Adoptions would be taking over the case.

64. On or about March 2014, M.C. hired an attorney to deal with B.P. adoption and excluded SWENSON from the process because she was unreliable.

65. On or about July 15, 2014, B.P. gave birth to a baby boy and B.P. decided to keep the baby.


66. On or about each of the dates set forth below, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

**SIMONE SWENSON,**

for the purpose of executing the scheme described above, and to obtain money from others by material false and fraudulent representations, pretenses, and promises, did knowingly cause to be submitted by means of wire communication in interstate commerce the signals

and sounds described below for each count, each transmission constituting a separate count:

| Counts | Date | Wire Communication |
|---|---|---|
| 1 | October 29, 2013 | $2,300 wire transfer from prospective adoptive family M.S. Chase Bank account xxxx-0407 to Sans Pareil's Bank of America account xxxx-6024 for birth mother expenses and termination fees for T.P. |
| 2 | January 15, 2014 | $8,550 wire transfer from D.W.(for M.C.) U.S. Bank account to Sans Pareil's Bank of America account xxxx-6024 for fees related to birth mother B.P. |

All in violation of Section 1343 of Title 18 of the United States Code.

## COUNTS THREE AND FOUR
## (MAIL FRAUD 18 U.S.C. § 1341)

67. Paragraphs 1-66 are incorporated and re-alleged herein.

68. On or about the dates set forth below, in the Houston Division of Southern District of Texas and elsewhere, the defendant

**SIMONE SWENSON**

for the purpose of executing and attempting to execute the above described scheme and artifice to defraud, and to obtain money by means of false and fraudulent pretenses and representations and promises, knowingly caused to be delivered by the United States Postal Service, envelopes containing checks for payment of fees related to adoption placement made payable to the defendant, as set out below:

11

| Count | On or about date | Item Sent | Sender | Sent to |
|---|---|---|---|---|
| 3 | June 5, 2013 | Cashier's Check No. 4462004811 payable to "Sans Pareil Center for Children" | D.C. | Sans Pareil Center for Children |
| 4 | September 18, 2013 | Check No. 500179 payable to "Sans Pareil Center for Children" | A.N. | Sans Pareil Center for Children |

All in violation of Title 18, United States Code, Section 1341 (18 U.S.C. § 1341).

## NOTICE OF CRIMINAL FORFEITURE
## 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the Defendant, SIMONE SWENSON, that in the event of conviction of the offenses charged in Counts 1-4 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

### Money Judgment

Defendant is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, in the amount of at least $111,000.

### Substitute Assets

Defendant is notified that in the event that property subject to forfeiture, as a result of any

act or omission of Defendant,

    (A) Cannot be located upon the exercise of due diligence;

    (B) Has been transferred or sold to, or deposited with, a third party;

    (C) Has been place beyond the jurisdiction of the court;

    (D) Has been substantially diminished in value; or

    (E) Has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the Defendant up to the total value of such property pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 28, United States Code, Section 2461(c).

A TRUE BILL

Original Signature on File
FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON
UNITED STATES ATTORNEY

By: /s/ Tina Ansari
Tina Ansari
Assistant United States Attorney
(713)567-9598