Case 4:15-cr-00402   Document 204   Filed on 05/07/20 in TXSD   Page 1 of 12

United States District Court
Southern District of Texas
**ENTERED**
May 07, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | |
| VS. | § § § § § § | CRIMINAL ACTION NO. H-15-402 |
| SIMONE SWENSON | § | |

**MEMORANDUM AND OPINION**

Simone Swenson owned and operated an adoption agency. The government indicted her for defrauding prospective adoptive parents by "double matching" them with one birth mother and keeping the hopeful parents' up-front payments to Swenson's agency even after the adoption failed. Count 1 was a wire-fraud charge corresponding to an alleged double match created in July 2013, Count 2 was a wire-fraud charge relating to another alleged double match from January 2014, and Counts 3 and 4 were mail-fraud charges corresponding to a third double match in September 2013. (Docket Entry No. 1 at 4–10).

In September 2019, a jury acquitted Swenson of the wire-fraud charges but convicted her for mail fraud. (Docket Entry No. 172). Swenson moved for a judgment of acquittal on Count 3, arguing that there was insufficient evidence that she caused the mailing at issue to be delivered for the purpose of carrying out the fraud scheme. (Docket Entry No. 168). The mailing was a June 2013 agency fee and birth mother expense payment for a match between the Cuschieri family and a birth mother named Miggie. This match fell through. In September 2013, Swenson applied the Cuschieris' June 2013 payment for a match with another birth mother, Ashley Smolt, who Swenson also allegedly matched with another prospective adoptive couple, the Neidrichs.

The government responded that the evidence of Swenson's guilt on Count 3 was sufficient. (Docket Entry No. 176).  After receiving the parties' submissions, the court ordered and received supplemental briefs from both sides, seeking to resolve this motion on the firmest possible legal and factual basis.  (Docket Entry Nos. 190, 201–202).

After careful review of the filings, the trial record, and the applicable law, and giving the jury verdict the deference a court must show, the court grants the motion for a judgment of acquittal as to Count 3.  The government did not present enough evidence to show, beyond a reasonable doubt, that in June 2013—three months before the double match with birth mother Smolt—Swenson attempted to advance a fraud scheme by requesting the mailing of a payment for a match with a different birth mother, Miggie.  This decision does not undermine the jury's guilty verdict on Count 4.  Nor does it raise a question as to whether Swenson acted fraudulently by matching the Cuschieris and the Neidrichs, both would-be adoptive couples, with a single birth mother, Smolt, in September 2013.

The reasons for the ruling are set out below.

**I.    Background**

To support the mail-fraud charges arising from the September 2013 alleged double match, the government called the following witnesses:

- Ashley Smolt: the birth mother at the center of the alleged double match.

- Daniel Cuschieri: the prospective adoptive parent who mailed the June 2013 payment that was applied first to a match with birth mother Miggie and then to the alleged double match with Smolt in September 2013;

- Annise Neidrich: a prospective adoptive parent who the government alleged was also matched with Smolt in September 2013;

- Katie Kelley: a former employee of Simone Swenson from June to September 2013; and

- Tila Johnson: a manager at the Texas Office for Residential Child Care Licensing, who investigated Swenson's agency's compliance with Texas adoption regulations after receiving complaints around September 2013.

Simone Swenson testified in her own defense.

Daniel Cuschieri testified that on or about June 5, 2013, he mailed Swenson a check for $13,400 to cover part of the agency fee and expenses for birth mother Miggie; that the match with Miggie failed (he did not say why); and that the $13,400 payment "roll[ed] over" to the Cuschieri family's match with Ashley Smolt. (Docket Entry No. 191 at 7–8). The government alleged that Swenson's agency first contacted Smolt in August 2013,[1] and that this second match occurred in September 2013. The roll-over of the Cuschieris' fee reflected what Swenson described as her standard policy: that if a prospective family's match failed, the agency fee that the family paid would be reapplied until the family had a successful match. Swenson testified that her agency's contract with parents stated that the agency fee, and the birth mother's expenses that adoption applicants also had to pay, were not refundable.

The parties disputed whether Swenson matched Smolt with both the Cuschieris and the Neidrichs, promising Smolt's unborn baby to both families. The two families cut ties with Swenson's agency after Smolt chose to keep her baby, depriving both families of the adoption they sought. Daniel Cuschieri testified that he and his partner did not withdraw immediately because they "had already invested so much money and . . . were very hopeful." (*Id.* at 20). Cuschieri stated that he was reluctant to give up even though, at Swenson's suggestion, he and his partner had flown from Detroit to Houston to adopt Smolt's child, only to leave empty handed after the adoption fell through and after enduring communication breakdowns with Swenson during the

---

[1] This point came out during Smolt's direct examination. (Docket Entry No. 195 at 71).

trip. Daniel Cuschieri testified that he did not request or receive a refund for the approximately $30,000 he had paid Swenson by the end of the ordeal.

Smolt testified that she kept her child because, very shortly before she gave birth, Swenson tried to convince her to give the baby to the Cuschieris despite having initially told her the Neidrichs would be adopting the baby. Smolt stated that Swenson falsely told her that the Neidrichs had backed out of the adoption. Smolt testified that she would have given her baby to the Neidrichs if she had been given the chance.

Swenson disputed Smolt's account. She testified that the Neidrichs did not reach a formal arrangement for a match with Smolt because they failed to pay the agency on time; the agency received the Neidrichs' payment only after Smolt gave birth, and the agency sent the payment back; and Smolt simply decided that she wanted to keep and raise her child. Swenson stated that up until Smolt changed her mind about adoption, Swenson had believed that Smolt would place her baby with the Cuschieris.

The government also presented testimony on Swenson's business practices, claiming that they showed that Swenson had devised and executed a "broad scheme to defraud." (Docket Entry No. 201 at 14). Katie Kelley, who joined Swenson's agency approximately eight days after the Cuschieris mailed the June 2013 payment,[2] testified that Swenson intentionally stopped returning families' calls after they paid their adoption fees; did not provide or keep receipts and invoices; spoke about families in a "dehumanizing" way; expressed annoyance when prospective adoptive parents asked reasonable questions; recruited birth mothers from vulnerable populations without properly vetting them or confirming their pregnancies; and did not communicate with the birth

---

[2] (Docket Entry No. 199 at 5).

mothers' doctors. Kelley testified that she told Swenson her concerns about these practices, but Swenson gave only a dismissive response.

Finally, Kelley testified that Swenson intentionally double-matched multiple adoptive parents with a single birth mother and kept both sets of agency fees. Kelley stated that she specifically observed a double match involving the Cuschieris, the Neidrichs, and Ashley Smolt, though Kelley did not work on that match. According to Kelley, despite Swenson's questionable practices, Swenson's agency did oversee successful adoptions. The agency worked with approximately 40 birth mothers and 20 prospective adoptive families during Kelley's tenure. Kelley testified that she did not learn of any double matching until September 27, 2013, three days after she had given Swenson two weeks' notice of her resignation. (Docket Entry No. 199 at 40). She testified that when she raised the double-matching issue with Swenson over the phone, Swenson hung up on her and sent her an email stating that her resignation was accepted immediately.

Tila Johnson, the Texas Office for Residential Child Care Licensing manager, testified that she investigated Swenson's agency in September 2013, after receiving complaints from disappointed adoptive parents. Johnson testified that she met with Swenson and asked her for receipts associated with the adoptions her agency processed. Swenson produced receipts, but, according to Johnson, they were not clearly linked to specific cases. Johnson determined that Swenson did not keep adequate records, charged adoption fees without following a set schedule, failed to conduct adequate preadoption screenings of prospective adoptive parents, and matched birth mothers with multiple prospective adoptive parents. According to Johnson, Swenson explained the double matching by stating that she had a second family lined up in case the first

backed out of an adoption. Johnson stated that she had not come across an agency that did double matches before.

Johnson concluded her investigation in November 2013. She found that Swenson had violated adoption regulations, and all but one violation finding was upheld in a subsequent administrative review. Johnson testified that instead of implementing a corrective action plan, Swenson voluntarily suspended her agency in 2014—which allowed her to keep her adoption-agent permit but required her to stop adoption operations—and ultimately closed the agency.

During Johnson's testimony and before final jury deliberations, the court instructed the jury that regulatory violations are not crimes in themselves and may be considered only to "decide whether or not Ms. Swenson intended to violate the law" as alleged in the indictment. (Docket Entry No. 165 at 6).

On Counts 3 and 4 of the indictment, the jury found that Swenson used the Cuschieris' June 2013 payment and the Neidrichs' payment, mailed in September 2013, to further a scheme to defraud. Post-verdict, the parties dispute whether the government presented sufficient evidence for the jury to find, beyond a reasonable doubt, that on or about June 5, 2013, Swenson caused the Cuschieris to mail their payment to advance a fraud scheme. The government relied on Daniel Cuschieri and Katie Kelley's testimony in its responses to Swenson's motion.

The court considers the arguments against the record and the applicable legal standards.

## II. The Legal Standards

### a. The Motion for a Judgment of Acquittal

When a defendant challenges the sufficiency of the evidence, the court upholds the verdict if "*any* rational trier of fact could have found the essential elements" of the counts of the conviction, beyond a reasonable doubt. *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th

Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The court views the evidence, circumstantial and direct, in the light most favorable to the government, drawing reasonable inferences to support the jury's verdict. *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012). "It is not necessary that the evidence exclude every rational hypothesis of innocence." *United States v. Alaniz,* 726 F.3d 586, 601 (5th Cir. 2013). A jury may reasonably construe the evidence, making choices on weight and credibility. *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007); *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007), *cert. denied*, 552 U.S. 1221 (2008). The court's "inquiry 'is highly deferential to the verdict.'" *Alaniz*, 726 F.3d at 601 (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002)).

    b.   **The Elements of Mail Fraud**

To prove that a defendant committed mail fraud under 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt that: (1) the defendant devised a scheme to defraud; (2) the defendant used the mails to execute that scheme; (3) the defendant had specific intent to defraud; and (4) the defendant made a material misstatement in the course of the scheme. *United States v. Strong*, 371 F.3d 225, 227 (5th Cir. 2004); *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002); *see also Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995) ("In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'")). The second element, "[t]he required nexus between the defendant's fraudulent scheme and her use of the mails in furtherance of that scheme[,] . . . is the element that provides a basis for exerting federal jurisdiction over the crime of mail fraud." *United States v. Evans*, 148 F.3d 477, 483 (5th Cir. 1998); *see also Kann v. United States*, 323 U.S. 88, 95 (1944) ("The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which

the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."). The parties dispute the sufficiency of the evidence as to this element.

"The question . . . is whether the mailing[] [itself] somehow contributed to the successful continuation of the scheme—and, if so, whether [it was] so intended by [the defendant]." *Strong*, 371 F.3d at 230 (citing *Schmuck v. United States*, 489 U.S. 705, 711–12 (1989) and *United States v. Shively*, 927 F.2d 804, 814 (5th Cir. 1991)). "[T]he use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." *Schmuck*, 489 U.S. at 710–11 (quotation marks, alteration, and citations omitted). The parties agree that the government must prove that, at the time of the June 2013 mailing, Swenson intended to use the mailing to execute a fraud scheme. (Docket Entry No. 201 at 3; Docket Entry No. 202 at 1); *see also Schmuck*, 489 U.S. at 715 (emphasis added) ("The relevant question at all times is whether the mailing is part of the execution of the scheme *as conceived by the perpetrator at the time*."); *United States v. Gibson*, 708 F.2d 344, 346 (8th Cir. 1983) ("Actions of the defendant involving the mails taken prior to the origination of the scheme to defraud . . . cannot be the basis for convictions under the federal mail fraud statute.").

**III. Analysis**

The government argues that the key to Swenson's fraud scheme "was her urgency to obtain the bulk deposit fee upfront." (Docket Entry No. 201 at 5). This agency fee was the largest portion of prospective adoptive parents' payment to Swenson's agency, above the periodic payments for the birth-mothers' expenses. The government contends that Swenson's promise to roll over the agency fee to a new match if a previous match failed "ke[pt] many adoptive family members from leaving her agency and [persuaded them to continue] to [send] more [expense payments to the agency] upon numerous failed matches." (*Id.*). The defense did not dispute that Swenson's

8

arrangement with the prospective adoptive parents allowed Swenson to keep nonrefundable agency fees if a frustrated family eventually cut ties with her agency.

The government contends that Daniel Cuschieri and Katie Kelley's testimony shows that "Swenson was engaged in a broad scheme to defraud, and that a number of payments by family members were made over at least a 6 month period of time." (*Id.* at 14). The issue is whether, in Swenson's mind in June 2013, the scheme included Daniel Cuschieri's June 2013 mailing of the partial agency fee and expenses for the then represented match with birth mother Miggie. (*Id.* at 3).

The prosecution emphasizes that Swenson rolled the June 2013 payment over to the match with Ashley Smolt after the match with Miggie failed, and that the expensive deposit made Cuschieri reluctant to stop working with Swenson even after significant communication failures and the failed adoption. (*Id.* at 17).

The government's case falters because of its emphasis on Swenson's general business practices and its lack of specific evidence as to the purpose of the June 2013 mailing when it occurred. The Fifth Circuit instructs that even if a mailing contributes to a scheme's success, the prosecution must also show that the defendant intended that result. *Strong*, 371 F.3d at 230 ("The question . . . is whether the mailing[] [itself] somehow contributed to the successful continuation of the scheme—and, if so, whether [it was] so intended by [the defendant].)"; *United States v. Tencer*, 107 F.3d 1120, 1126 (5th Cir. 1997) ("[W]e decline to endorse a broad reading of § 1341's mailing requirement that would relieve the government of the burden of proving that mailings underlying mail fraud counts are related to the fraud being perpetrated."); (Docket Entry No. 201 at 3 (emphasis added) (the government agrees that "[t]he relevant question . . . is whether the mailing is part of the execution of the scheme *as conceived by the perpetrator at the time*")).

It is undisputed that, notwithstanding her alleged failures as a businessperson and the botched matches discussed in this case, Swenson did arrange and finalize a number of successful adoptions.[3] (Docket Entry No. 199 at 42). Her promise to roll over the agency fee if a match failed applied across the board, not only to the matches at issue here. (Docket Entry No. 201 at 5). And the jury acquitted Swenson of the two wire-fraud charges corresponding to other alleged double matches involving other families. (Docket Entry No. 172).

The government relies on a general claim that Swenson had a "broad scheme to defraud." That does not provide enough evidence to convince a rational jury, beyond a reasonable doubt, that in June 2013, Swenson caused the Cuschieris to mail their fee to perpetuate a fraud scheme. *See Strong*, 371 F.3d at 231 ("There is no question . . . that the evidence overwhelmingly establishes that [the defendant] was engaged in a broad scheme to defraud, . . . . Yet the government has presented little evidence linking the mailings to [the defendant's] fraudulent scheme such that . . . [the defendant] intended th[ese] mailing[s] [to be] part of his scheme.").

The defense identifies several weaknesses in the government's argument about the June 2013 payment. First, that mailing—originally meant for a match with birth mother Miggie—happened months before Swenson's agency first made contact with birth mother Ashley Smolt in August 2013,[4] and even longer before the alleged double match with birth mother Smolt in September 2013. (Docket Entry No. 202 at 5). Second, Katie Kelley did not start working for Swenson until approximately eight days after Daniel Cuschieri mailed the deposit; Kelley did not

---

[3] *See Tencer*, 107 F.3d at 1126 ("As the government acknowledged, [the chiropractic clinic where the defendants worked] submitted some valid [insurance] claims for legitimate treatment. Consequently, [and because the prosecution failed to produce any evidence tending to connect these individual checks with fraudulent claims,] the government's evidence is insufficient to establish that the checks . . . were used to execute the scheme to defraud.").

[4] (Docket Entry No. 202-3 (Smolt testified that Swenson's representative approached her in "the middle of August")).

10

work with Swenson when she initiated the mailing, or before then. (*Id.* at 2). Third, Kelley did not notice evidence of any double matching until late September 2013, more than three months after the mailing of the June 2013 check. (*Id.* at 2–3). Fourth, the government's witnesses did not link Swenson's questionable business practices or any evidence of fraud to the failed match with Miggie. (*Id.* at 3). The defense contends that even if a fraudulent double match happened in September 2013, that "does not establish fraudulent activity months earlier in June 2013 before any of the persons involved had even heard of [Ashley Smolt]." (*Id.* at 5–6).

The government counters by citing cases holding that "mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints[,] or make the transaction less suspect are mailings in furtherance of a scheme." (Docket Entry No. 201 at 14 (citing *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir. 1975)). In *Ashdown*, 509 F.2d at 799–800, the Fifth Circuit held that annual reports mailed after fraudulent stock sales helped lull investors into keeping the stocks and thinking they made good investments. In *Schmuck*, 489 U.S. at 707, the Supreme Court considered a case in which a defendant was accused of buying used cars, rolling back the odometers to show low mileage, and reselling the cars to dealers at inflated prices. The dealers in turn sold the cars to new owners and mailed the title applications to the state department of transportation, transferring ownership of the cars to the new owners. *Id.* The Supreme Court held that a rational jury could find that the scheme depended on the defendant's good relations with the car dealers, which in turn depended on using the mails to pass title of the cars to the dealers' customers. *Id.* at 711–14. The government argues that *Schmuck* and *Ashdown* apply because Daniel Cuschieri testified that the amount of money he invested with Swenson motivated him to keep working with her. (Docket Entry No. 201 at 17).

11

*Schmuck* and *Ashdown* are distinguishable because in those cases, there was enough evidence that, by the time of the mailings in question, the defendants had already implemented and participated in schemes to defraud. In those cases, most of the fraudulent activity had occurred *before* the lulling mailings. *See Schmuck*, 489 U.S. at 711–12; *Ashdown*, 509 F.2d at 799–800. Here, the mailing at issue occurred months before the events giving rise to the alleged fraud. The government has not identified enough evidence about Swenson's conduct or state of mind in early June 2013, to show that she caused the Cuschieri's mailing for the purpose of advancing the scheme to defraud—the scheme allegedly involving a double match with a birth mother whom Swenson did not even know until months later. Even if the mailing ultimately contributed to the scheme because Swenson kept the money after the failed match with Miggie and applied the money to the alleged double match with Smolt, the government has not provided enough evidence of that purpose in June 2013 to prove Swenson's guilt on Count 3 beyond a reasonable doubt. *See Strong*, 371 F.3d at 230–31. The government's argument about Swenson's "broad scheme to defraud," as shown by her business practices after the June 2013 mailing, is not enough. *See id.*

## IV.  Conclusion

This court does not disturb any part of a jury verdict lightly. In granting Swenson's motion as to Count 3, the court emphasizes that its ruling does not address whether Swenson fraudulently double matched the Cuschieris and the Neidrichs with birth mother Ashley Smolt in September 2013. The government's evidence was insufficient only as to the Count 3 allegations. The verdict otherwise stands.

SIGNED on May 7, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge